### GREENE et al. v. O'CONNOR et al.
### No. 85.

Circuit Court of Appeals, Second Circuit.
Dec. 6, 1937.

Joseph R. Truesdale, of New York City (Murray C. Bernays, Abraham Friedman, and Raymond H. Berry, all of New York City, of counsel), for appellants.

Hays, Wolf, Kaufman & Schwabacher, of New York City (Wolfgang S. Schwabacher, Solomon I. Sklar, and Sydney C. Weinstein, all of New York City, of counsel), for appellees Rubenfeld and Sklar, executor.

Alexander D. Smith, of New York City (Maurice Smith, of New York City, of counsel), for appellee O'Connor.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree dismissing on the merits a bill in equity filed by the receivers of the Metropolitan Dairy Products, Inc., against five individuals and two corporations, to rescind a sale by that company to the defendants, Rubenfeld and Sobel—together with one, Leiter, not a party—of all the shares of stock of two companies, the corporate defendants. (It will be convenient to disregard the plaintiffs, and to speak of the Metropolitan Dairy Products, Inc., as itself the plaintiff, and of the two defendant companies, whose shares were sold, as the Middletown Companies.) The equity of the bill is that Leiter and O'Connor, who were directors of the plaintiff, disposed of the Middletown shares in dereliction of their fiduciary duty, and that Rubenfeld and Sobel, by confederating with them, rendered themselves equally liable to an accounting. The facts as found by the judge were as follows. For some time before 1927 Rubenfeld, Leiter and Sobel owned all the Middletown shares; somewhat later they took in one, Max, and in October, 1928, all but Leiter sold out their in-terests to Klein, Goodman and Abrams, both companies being then valued at $388,-000. In April, 1929, Klein, Goodman and Abrams in turn sold their shares to O'Connor at the same figure; whereupon he and Leiter, who had thus become the sole owners, organized the plaintiff, to which they assigned the Middletown shares in exchange for 100,000 of the plaintiff's shares; O'Connor taking 63,750 and Leiter 36,250. Leiter became the president, and managed the business; O'Connor, a promoter, was vice-president. In the following July the plaintiff, through O'Connor, bought the shares of another dairy, Tietjen & Steffen, valued at $167,670, which it paid for with 50,000 shares of its stock; in August it contracted to buy the assets of a retail dairy known as the Kent Model Dairy for $100,000. Through Leiter's long experience in the business, he had acquired a personal goodwill among the customers of the Middletown Companies, though it does not appear that this was while he was acting as their director or officer. Because of this good-will his possible competition was feared in case he left the companies, though he was proving unsatisfactory to O'Connor, who neither liked nor trusted him. By November the companies were short of funds, and Rubenfeld and Sobel wished to reacquire them; therefore, on November 21st with Leiter, whom they needed for the reason just given, they submitted an offer to the plaintiff—to be accepted by December 10th—to buy the Middletown shares for $343,000 (with certain adjustments not necessary to mention); $160,000 payable in cash, $80,-000 by a demand note, and the balance in time notes, running over about two and a half years. The ninth article of this offer made it a condition that "satisfactory arrangements" should be "made between Howard O'Connor and the said mentioned Isador Leiter for the payment to the said Isador Leiter of his share or interest in Metropolitan Dairy Products, Inc. and the return to him simultaneously with the passing of title herein to the businesses mentioned of the said demand note for $80,000." Although the offer lapsed on December 10th, apparently the negotiations were not dropped; for by December 18th one, Garey—O'Connor's lawyer, who had been retained not long before—had agreed with Leiter upon $5.20 as the price for his remaining shares in the plaintiff, 27,500. O'Connor had been selling the shares at much higher figures ranging from $14 down to $6.25, and Garey had had difficulty in beating down the

price, but after this figure had been agreed on, Leiter, Rubenfeld and Sobel made a new offer to the plaintiff, which came before a meeting of the board of directors on December 23d. They were to pay $200,000 in cash (subject to adjustments), and Leiter was to "donate" his shares in the plaintiff as an "inducement" to the bargain. Leiter was not present at the meeting and did not vote, and Garey testified that the directors were fully informed of the original offer, of the price at which Leiter's shares were appraised, of the necessity of selling the properties because the earnings had been decreasing, of the lack of confidence in the integrity and ability of Leiter, and of the necessity of his continued connection with the Middletown Companies because of the danger to them from his competition. The directors, so informed, accepted the proposal, and appointed a special committee to prepare the contract, which was completed by January 2d. One, Weinberg—the lawyer for Rubenfeld, Sobel and Leiter—insisted that the shareholders should assent, and a meeting was called on January 14th for the 24th, at which the minutes of the directors' meeting of the 23d, the contract of January 2d and Leiter's letter were read. The directors' minutes did not record the original offer of November 21st, and only stated that a cash price of $200,000 together with Leiter's "donation" of his shares had been offered for the Middletown shares. The shareholders confirmed the contract by a large vote, and their action was later ratified on April 17th at the annual shareholders' meeting. On these findings the judge held that all facts relevant to the transaction had been disclosed, and that the plaintiff had not been overreached.

The only debatable question of fact is as to the completeness of the disclosure at the directors' meeting on December 23d, and as to how the parties had in fact understood the ninth article of the offer of November 21st. As to both the judge accepted the word of Garey, and although there was contrary testimony, we see no reason to disturb the finding. Indeed, it seems to us for the following reasons that the documentary evidence confirmed it. The plaintiff's case presupposed that the original offer was better than the contract, and was for that reason suppressed; that was its chief count against the transaction as a whole. If it was not in fact better, the argument disappears, for there was no reason to suppress what would have been harmless if disclosed. The first question is therefore what the ninth article really meant. The plaintiff says that O'Connor was not only to make "satisfactory arrangements * * * for the payment" of Leiter's interest, but was to buy it himself; and that he would have had to pay $80,000 into the treasury in order to "return" the note. If so, the article was drawn very badly, for it was totally unnecessary to "return" the note; Leiter could have paid it—or, indeed, any of the other notes—as soon as he received the cash. The words do not naturally mean that O'Connor should take it up, and it is curious, if he was to do so, that his duty should have been so ill defined. True, it is difficult to see why the note should have been given if the plaintiff was to "return" it at once; but it is equally difficult to see why it should have been given, if O'Connor must pay it and "return" it. However, so far as the language was equivocal, the parties cleared it up in O'Connor's letter of January 4, 1930. That was written, as it shows on its face, to allow the buyers to take $343,000 as their tax "basis," if they sold the Middletown shares; it said that the "real deal" was for $343,000 in cash, and by "real deal" it of course meant not the original offer, but the actual sale. Confessedly upon the sale Leiter's shares were accepted instead of cash, and the only possible conclusion is that the parties considered them cash. If they did so then, they presumably did so in the original offer, and the ninth article meant what Garey said everyone agreed that it meant. A reason why the contract of sale, unlike the offer, did not state the consideration as wholly cash is reasonably explained by the fact that in the plaintiff's income tax return, Leiter's shares were valued not at $5.20, but at about $3.19, that being their cost on the corporate books; and that in this way the whole transaction was made to show a loss, and was so accepted by the taxing officers. The formal change to a sale for $200,000, accompanied by a collateral promise by Leiter to "donate" his shares as an "inducement" from a sale for $343,000, of which Leiter's shares were to be taken at an agreed price, was of no moment whatever, once the share price was fixed at $5.20. From all this we conclude that the sale was in substance the same as the offer, that there was no motive to conceal it, and that the judge's finding—which might indeed stand without it—was clearly right.

Yet although the original offer was disclosed, it does not follow that everything else was, or that the valuation of Leiter's shares was justified. Their book value was not $143,000. The balance sheet of the plaintiff after the Middletown shares are deducted is in evidence; it shows assets of $558,000 and liabilities of $41,000, or a net value of $517,000, which gives to each of the 150,000 shares a book value of about $3.25, and creates an excess allowance of nearly 54,000 for Leiter's 27,500 shares. The defendants justify this by saying that the shares were worth more than their book value, that it was desirable to get rid of Leiter, and that the Middletown shares, owing to his power effectively to compete with the companies, had the agreed value only in case he went along with them. It is true that the shares had always sold for more than $3.25; indeed, even after the October slump one, Claggett, was still offering them for $14.50 a share, though it does not appear that he sold any. Moreover, in January, 1930, the market had somewhat recovered from its first sharp drop and it may be that $5.20 was still a possible price. But that aside, it was legitimate for the plaintiff to pay a substantial sum to get rid of Leiter, if it could not safely discharge him; and in fact it could not safely discharge him. So far as concerned O'Connor, we cannot see any possible answer to this, nor can we say that the allowance—even assuming that the value of the plaintiff's shares was no more than their book value—was unfair or beyond what directors might honestly fix. The situation might be different as to Leiter, who by hypothesis profited by his potential ability to compete with the Middletown Companies. It is true that he is not a party, but, as we have said, the bill charges that Rubenfeld and Sobel, who actually divided the profit with him, became confederates in this abuse of his position, and are charged with the same liability as he. That depends upon whether it is improper for a corporate officer to profit by a surrender of his power to make competitive use of a good-will which is his own property. It is of course true that a fiduciary may not compete with his beneficiary (Restatement of Trusts § 170 Comment a); but so far as we can find, that duty ends with the relation, and we can see no reason why it should not, at least if the good-will was not acquired during, and by means of, his position, so as itself to be impressed with the trust. The only cases we have been able to find, accord with this view, and, indeed, do not even impose the suggested limitation. Bristol v. Scranton (C.C.) 57 F. 70, affirmed (C.C.A.3) 63 F. 218; Heinz v. National Bank of Commerce (C.C.A.8) 237 F. 942, 953; Stover v. Gamewell F. A. Tel. Co., 164 App.Div. 155, 149 N.Y.S. 650.

The plaintiff replies that while this may be true after the director resigns, he may not make use of his power as a threat before he does. There is not a scintilla of evidence that Leiter ever threatened to compete if he was not taken along by Rubenfeld and Sobel, but it would make no difference if he had. If he might lawfully use his good-will competitively after he retired, he might lawfully bargain with the plaintiff about it before, provided all was open and at arm's length. It was like his other property, for, as we have already said, there is no evidence that he acquired it while acting as an officer of the Middletown Companies. Therefore, the case in this aspect depends upon whether the desirability of getting rid of Leiter, and his power to injure the Middletown Companies was fully disclosed at the meeting of December 23d. Garey says it was, and in this he was not contradicted; clearly we should not disturb that finding.

We think, therefore, that the defendants satisfied the burden of proving that everything essential was disclosed to the directors, and that there was no overreaching. That ends the case, because the charter gave the directors power to sell the shares without the assent of the shareholders. The plaintiff argues that nevertheless, if all was not disclosed to the shareholders at their meeting, the sale may be rescinded, because, although the directors might have acted alone, they did not choose to do so, and the condition which they imposed was hedged by the same limitations as their own action. There is, however, no evidence that the directors ever required the shareholders' assent. The original offer had said that all formalities must be approved by Weinberg; and the contract, that all papers and "legal proceedings" should be approved by the respective counsel of both parties; but it was Weinberg, not the directors, who insisted upon the shareholders' assent. He or his clients might forego that which he alone had demanded; as for the plaintiff, it was

concluded by its directors, and could be held, if the buyers were content. We agree with Judge Woolsey that the whole case "is based principally on innuendo"; it has no solid support whatever.

Decree affirmed.